**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**KENNETH D. PITTS,**

       **Plaintiff,**

**v.**                                     **CASE NO.  3:05cv60/RS/EMT**

**AUTOZONERS, INC.,
d/b/a AUTOZONE,**

       **Defendant.**

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant's Motion for Summary Judgment (Doc. 41).

## I.  FACTS

Plaintiff Kenneth D. Pitts was initially hired by Defendant AutoZone as a parts sales manager (PSM) at its store in Pensacola, Florida, in July 1994.  Pitts was promoted to the positions of store manager in 1996 and then to trainee as a district manager in Kansas.  Because of lower than expected profits, AutoZone did not pursue development of its Kansas market, and Pitts assumed the position of store manager in Kansas City rather than district manager.  Pitts voluntarily left AutoZone in June 1999 after obtaining other employment.  Four years later, in August 2003, Pitts was offered a position by AutoZone as district manager in Kansas.  Pitts declined the district manager position because he and his wife wished to relocate to Pensacola, Florida, to be near their families.  AutoZone offered and Pitts accepted the position of store manager at AutoZone's Pensacola store commencing in August or November 2003.

As store manager, Pitts's immediate supervisor was district manager Willisha[1] Pate, a female.  The Initial Complaint (Doc. 40) alleges that Pate treated male employees less favorably than female employees.  Pitts was terminated by AutoZone on February 18, 2004, and replaced with a female.  Pitts contends that a determinative

_____

[1]Various spellings of Ms. Pate's first name appear throughout the record as "Willisha," "Wallisha," and "Wilisha."

factor in AutoZone's decision to terminate him was his sex, in violation of the Florida Civil Rights Act of 1992.

AutoZone contends that Pitts was terminated for legitimate, nondiscriminatory reasons after he and Pate engaged each other in a telephone altercation in the presence of several AutoZone customers while Pate was tending to a hospitalized family member.  AutoZone filed a Motion for Summary Judgment (Doc. 41) on April 5, 2006.  Federal jurisdiction is based on diversity.

## II.  DISCUSSION

### A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).  "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251, 106 S. Ct. at 2512.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  Adickes v.

S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)).  However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at 251, 106 S. Ct. at 2511).

If the movant satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."  Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255, 106 S. Ct. at 2513 (citing Adickes, 398 U.S. at 158-59, 90 S. Ct. at 1609).  In light of the summary judgment standard, this Court will apply the relevant substantive law to the facts of the case.

## B.  Sex Discrimination

Under the Florida Civil Rights Act ("FCRA"), "[i]t is an unlawful employment practice for an employer . . . [t]o discharge . . . any individual or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  Fla. Stat. § 760.10(1)(a).  "A claim under the FCRA is analyzed under the same standards as a Title VII claim."  Tippie v. Spacelabs Medical, Inc., 2006 U.S. App. LEXIS 10658, *3 n.1 (11th

Cir. 2006) (citing Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998)); see also Stevens v. Steak n Shake, Inc., 35 F. Supp. 2d 882, 886-87 (M.D. Fla. 1998) (applying Title VII elements to case arising under FCRA); The Florida State Univ. v. Sondel, 685 So. 2d 923, 925 (Fla. 1st DCA 1996) ("Federal case law interpreting Title VII . . . is applicable to cases arising under the Florida Act") (citation omitted); Florida Dep't of Comty. Affairs v. Bryant, 586 So. 2d 1205, 1208 (Fla. 1st DCA 1991).

A plaintiff may establish that a discharge was discriminatory in one of three ways: (1) direct evidence of discriminatory intent; (2) statistical proof of a pattern of discrimination; or (3) satisfying the test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Direct evidence of discrimination is "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987) (quoting Black's Law Dictionary 413 (5th ed. 1979) (citation omitted) (emphasis omitted)). "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990) (citing Hill v. Metropolitan Atlanta Rapid Transit Authority, 841 F.2d 1533, 1539 (11th Cir. 1988); Thompkins v. Morris Brown College, 752 F.2d 558, 563 (11th Cir. 1985); Dunning v. National Industries, Inc., 720 F. Supp. 924, 929 n. 6 (M.D. Ala. 1989)). "'Only the most blatant remarks, whose intent could be nothing other than to discriminate . . .' will constitute direct evidence of discrimination." Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999) (citing Early v. Champion Int'l Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990) (citations omitted)). Here, Pitts does not allege that Defendant made blatant discriminatory remarks or otherwise demonstrated unequivocal animosity toward males. Therefore, Pitts has not shown direct evidence of discriminatory intent.

Pitts has also failed to demonstrate statistical proof of a pattern of discrimination. Pitts alleges the following examples of a discriminatory pattern against males by Defendant: (1) Pitts was required to work oppressive hours of approximately ninety to one hundred hours per week while female managers worked approximately fifty hours per week; (2) Pitts was assigned tasks with impossible deadlines; (3) Pitts was not

provided with adequate staffing; (4) Pate tore up a discipline report written by Pitts against a tardy female employee, but Pate wrote a discipline report for a male employee who failed to shave and wore white socks to work; (5) Pitts was terminated after an altercation with Pate, while a female manager, Nancy Book, was not terminated after she had a similar encounter with Pate and Pate's superior; (6) male store managers were disciplined for failing to load, unload, or inventory a truck within twelve hours; (7) Pate audited stores run by male managers with closer scrutiny than stores run by female managers; and (8) Pate disciplined and terminated men but not women.  (Doc. 40:6 ¶ 13; Doc. 43:5-6.)  Allegations one through six do not show a pattern of discrimination against males because they are allegations concerning Defendant's treatment of Pitts solely.  Pitts does not contend nor does any evidence submitted to this Court indicate that other male employees at AutoZone were required to work oppressive hours, were assigned tasks with impossible deadlines, were not provided with adequate staffing, had discipline reports torn up, were terminated for cause while similarly situated female employees who had engaged in similar behavior were not terminated, or were disciplined for failing to load, unload, or inventory a truck within twelve hours.  Moreover, that Pate disciplined a single male employee for failing to shave and for wearing white socks does not demonstrate a statistical *pattern* of discrimination against males.

With respect to the seventh allegation that Pate audited stores run by male managers with closer scrutiny than stores run by female managers, the evidence also fails to support statistical proof of a pattern of discrimination against males.  Pate supervised twelve store managers, ten of them males and two of them females.  Of the ten male store managers under Pate, only two of them - Pitts and Michael Moore - contend that their audits were unfairly manipulated by Pate.  Moreover, Moore asserts that Pate inaccurately audited his store not because he was male but because he reported Pate for bringing sexually explicit material to work (Doc. 45-4:4-5.)  Thus, Pate's audit of Moore was not allegedly corrupted because of Moore's sex; rather, Pate allegedly manipulated the audit in *retaliation* for Moore's reporting of Pate.  Left standing is Pitts's sole claim that he was unfairly audited by Pate because of his sex, evidence that in itself is wholly insufficient to substantiate a claim of a statistical pattern of

discrimination against males.

With respect to the eighth allegation that Pate disciplined and terminated men but not women, the evidence also fails to support a statistical proof of a pattern of discrimination against males.  In fact, the evidence indicates that Pitts was the only male store manager in Pate's district who was replaced by a female.  Male store manager, Michael Moore, who was deposed and who submitted a statement on behalf of Pitts, testified at his deposition that:

Q.  When you were terminated or fired or resigned –

A.  We'll call it terminated.

Q.  – who took your store?

A. . . . I can't think of who took that right off the bat.  It was a guy.  I can't remember his name.  One of them that worked up in Crestview and they brought him down.  I don't remember his name.

Q.  Does it seem odd to you that you think Ms. Pate wants to run off all the guys and she's replacing male managers with males?  Does that seem odd to you.

A.  Nope.

Q.  So you still want to stick with your testimony?

A.  I'm going to stick to that.

Q.  Then when male managers left, she replaced them with guys?

A.  Hand-picked by her.

Q.  But they were still men?

A.  Yes.  Her favorites.

(Doc. 49-5:12, lines 3-24.)  Moore also admits that Pate was harsh on women.  Moore stated that "[Pate] started running the guys off first and then she ran off a couple of the lady managers also."  (Doc. 45-4:11.)  In fact, Moore explained that one of the two female managers under Pate, Nancy Book, resigned from AutoZone *because of Pate.*

(Doc. 49-5:8.)  When asked at her deposition why she left AutoZone, Book explained that "I was stressing and I just had a difficult time dealing with the district manager . . . Pate."  (Doc. 45-2:12, lines 11-15.) Indeed, Moore's deposition reveals why Pitts may not properly assert a claim of statistical proof of a pattern of discrimination against males with respect to discipline and termination:

> Q.    There were only two females in her market, store managers, right?
>
> A.  Right.  Mary -
>
> Q.  -- and Nancy Book?
>
> A.   And Nancy.  Nancy demoted and stepped down due to Willisha.  She wanted to back away.  Willisha pushed her buttons and she demoted.  She openly discussed leaving the company on several occasions at meetings.
>
> Q.  Nancy is a female?
>
> A.  Nancy is a female.
>
> Q.  Nancy's deposition was taken yesterday in this case and she indicated that she, in fact, quit AutoZone because of Willisha Pate.  Does that surprise you?
>
> A.  No.
>
> Q.  I thought your testimony was --
>
> A.  She was trying to ride the guys.
>
> Q.  But she rode Nancy Book enough that Nancy wanted to quit?
>
> A.  She might have.
>
> Q.  The fact of the matter is of the twelve some-odd stores Ms. Pate had, ten of those people were guys, weren't they?  Were there any other females besides Mary and Nancy that were store managers under Willisha Pate?
>
> A. There was another woman manager and I don't know when she left . . .

Q.  But you know for sure that Mary and Nancy were store managers under Willisha Pate?

A.  Mary and Nancy were store managers under Willisha Pate, yes.

Q.  And you know Nancy had such problems with Ms. Pate that she demoted herself?

A.  She discussed demoting, yes.

Q.  So I guess I'm confused.  Can we agree that the majority of managers under Ms. Pate's supervision were male?

A.  Yes.

Q.  And out of the two females that you know were under Ms. Pate's supervision, one of them, which would be half of them, felt like she was trying to get run off by Ms. Pate?

A.  Okay.

Q.  Are you with me?

A.  I'm with you.

Q.  So I'm confused as to why you say Ms. Pate was targeting the males when based on your own testimony she was targeting one of the two females.

A.  She might have been.  I don't know that much about her targeting.

Q.  You just testified that Nancy wanted to demote herself because of Willisha Pate and the treatment that Willisha was giving her.  Do you stand by that testimony?

A.  I still stand by that testimony.

(Doc. 49-5:8-10.)  Book's decision to leave AutoZone because of Pate, in conjunction with the undisputed facts that eighty-three percent of the store managers in Pate's district were men, and that Pitts was the only male in Pate's district who was replaced by a female, unequivocally permit but one reasonable conclusion:  Pitts has failed to demonstrate proof of a statistical pattern of discrimination against males.

Thus, if Pitts is to prove that his termination from AutoZone was discriminatory, he must do so based on circumstantial evidence.  When a plaintiff alleges discrimination based on circumstantial evidence, the court applies the three-tiered analysis set forth in McDonnell Douglas and refined in Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S. Ct. 1089, 1093-95 (1981).  See Byrd v. Lakeshore Hosp., 30 F.3d 1380, 1383 (11th Cir. 1994).  Under the McDonnell Douglas paradigm, a plaintiff is required to first establish, by a preponderance of the evidence, a prima facie case that creates a rebuttable presumption of unlawful discrimination.  McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.  "The plaintiff's burden of establishing a prima facie case serves, in part, to assure that the plaintiff has some competent proof that she was treated differently than similarly situated employees."  Lang v. Star Herald, 107 F.3d 1308, 1312 (8th Cir. 1997).  Second, if the plaintiff successfully establishes the prima facie case of discrimination, the burden of production "then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.  Finally, if the employer successfully articulates some legitimate, nondiscriminatory reason for the employee's rejection, the plaintiff must demonstrate by a preponderance of the evidence that the employer's stated reason for rejecting the employee was merely a pretext for discriminating against him.  Id. at 804; 93 S. Ct. at 1825.  Despite the shifting burdens of proof, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253, 101 S. Ct. at 1093.

**1.  McDonnell Douglas Step One:  The Prima Facie Case of Discrimination**

A plaintiff may establish a prima facie case of discriminatory discharge by demonstrating that he (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class.[2]  Cuddeback v. Florida Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir.

---

[2]Pitts alleges instances of discrimination during his employment other than termination.  These events are listed in the analysis of Pitts's claim of a statistical pattern of discrimination, supra.  However, these other allegations of discrimination appear to have been alleged solely for the purpose of bolstering Pitts's claim of discriminatory discharge and not for the purpose of stating separate claims of

2004) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000)); Hinson v. Clinch County Bd. of Educ., 231 F.3d 821, 828 (11th Cir. 2000).  Pitts has satisfied all requirements of the prima facie case.

First, Title VII, or in this case, the FCRA, protects both males and females from sex discrimination.  See Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 682, 106 S. Ct. 2622, 2630 (1983) ("Male as well as female employees are protected against discrimination"); Wilson v. Bailey, 934 F.2d 301, 304 (11th Cir. 1991) (reverse sex discrimination case); Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 386 (5th Cir. 1971), cert. denied, 404 U.S. 950, 92 S. Ct. 275 (1971) ("[I]t is reasonable to assume that one of Congress' main goals was to provide equal access to the job market for both men and women").  Therefore, Pitts has satisfied the first requirement of the prima facie case.

Second, AutoZone does not dispute that Pitts was qualified for the position from which he was rejected.  Pitts had several years of experience with AutoZone as assistant manager and then as store manager.  He was also selected to be district manager (and thus supervise store managers) prior to relocating to Florida and accepting the store manager position from which he was ultimately terminated.  Pate herself admits that Pitts's job performance did not warrant his termination.  Moreover, the Eleventh Circuit has stated that a plaintiff who has been discharged from a previously held position or who has held a position for a significant period of time is not required to satisfy the "qualification" prong of the prima facie case because such qualifications can be inferred.  Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999); Pace v. Southern Railway Sys., 701 F.2d 1383, 1386 n. 7 (11th Cir. 1983).  Thus, Pitts has satisfied the second requirement of the prima facie case.

Third, Pitts suffered an adverse employment action when he was terminated from

---

discrimination with respect to each allegation.  The elements of the prima facie case proffered by Pitts are elements that are specific to discriminatory discharge cases only.  Moreover, Pitts's proposed verdict forms and jury instructions (Docs. 52 and 53) request that the jury be instructed on and render a verdict solely on the issue of whether Pitts suffered discriminatory discharge, not on whether Pitts experienced the other alleged instances of discrimination.  Accordingly, this Order addresses the sole issue of whether Pitts was terminated on the basis of sex.

his position.  "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, that deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Galloway v. Ga. Tech. Auth., 2006 U.S. App. LEXIS 12042, *6 (11th Cir. 2006) (citing Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (internal quotation marks and citation omitted)).  Thus, Pitts has satisfied the third requirement of the prima facie case.

Finally, the parties agree that Pitts was replaced by a person outside the protected class - a female.  Pitts has satisfied the final requirement of the prima facie case of discrimination.

### 2. <u>McDonnell Douglas</u> Step Two: Employer's Legitimate, Nondiscriminatory Reason

Because Pitts has established a prima facie case for discriminatory discharge, the burden shifts to AutoZone to articulate a legitimate, nondiscriminatory reason for terminating Pitts.  In showing that it had a legitimate, nondiscriminatory reason for terminating an employee, the defendant's burden is "exceedingly light."  Perryman v. Johnson Prods. Co. Inc., 698 F.2d 1138, 1142 (11th Cir. 1983) (citing Burdine, 450 U.S. at 254-55, 101 S. Ct. at 1094).  "The defendant only needs to produce evidence of a reason for its decision; it does not need to prove that it was actually motivated by that explanation."  Sermons v. Fleetwood  Homes of Georgia, 227 F. Supp. 2d 1368, 1380 (citing Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).  "[The proffered reason] is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Burdine 450 U.S. at 254-55, 101 S. Ct. at 1094.  The defendant's burden at this stage of the analysis is "merely one of production, not of proof."  Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982).  "As long as the defendant articulates its reason with some specificity so that the plaintiff has a 'full and fair opportunity to demonstrate pretext,' the defendant's burden has been met."  Sermons, 227 F. Supp. 2d at 1380 (quoting Burdine, 450 U.S. at 255-56, 101 S. Ct. at 1095).

AutoZone has satisfied its burden of articulating a legitimate, nondiscriminatory

reason for terminating Pitts.  According to AutoZone, Pitts was terminated after engaging in a loud, heated telephone altercation with Pate while several customers were present in Pitts's store and while Pate was visiting a hospitalized family member. The parties agree that the argument related to scheduling and coverage for the store that Pitts managed.  AutoZone conducted an investigation, obtained statements from several employees who had witnessed the argument, and terminated Pitts for unprofessional behavior; conduct detrimental to AutoZone, its employees, and its customers; and loss of confidence.  Although Pitts contends that he did not raise his voice or use profanity during the altercation, he does acknowledge that he interrupted Pate during the telephone conversation and that the conversation did occur while customers were present.  (Doc. 45-9:3, lines 13-16; Doc. 45-9:4, lines 20-21.) AutoZone submitted four statements from employees who witnessed the argument. When asked to describe the events which transpired between Pitts and Pate during the telephone altercation, the employee-witnesses responded as follows:

**Witness 1 (Male)**

> a lot of yelling over the phone . . . At the time of the phone call there was (sic) about 6 people in the store.  When it started people stoped (sic) and was (sic) looking at Ken Pitts.  We tryed (sic) to help, and get the people out as fast as we could.

(Doc. 41-5:1, Exh. 3.)  When asked whether customers were offended, Witness 1 responded, "Yes.  Because of the yelling over the phone they didn't know what was going on." (Doc. 41-5:1, Exh. 3.)

**Witness 2 (Male)**

> I could hear Ken Pitts yelling at Willisha Pate over the phone. He was saying that he was working to (sic) much, and he wanted to quit.  He was being very disrespectful and we lost about 4 customers because of it.

(Doc. 41-7:1, Exh. 5.)

**Witness 3 (Male)**

> I was in the office when the conversation took place.  I found out about when (sic) Aneda the merchandiser came to the office and said that the Mgr. Ken Pitts should not be on the parts counter talking the way that he was.  She stated that he was on the phone with the DM Willisha Pate and that they had

> gotten into it on the phone.  I stated yes that shouldn't have
> happened . . . I was on the phone in the office but yes I could
> tell that his volume in his voice had gotten louder.

(Doc. 41-8:1, Exh. 6.)

**Witness 4 (Female)**

> I overheard Ken Pitts yelling on the telephone at Willisha.
> They were engaged in a conversation about the store
> conditions.  He was having this conversation at the parts
> counter.  There were customers waiting at the parts counter
> and I believe one [employee] at the register.  Mr. Pitt's (sic)
> behavior was shocking for me.  Being a long time [employee]
> I know that such behavior is not acceptable.  The customers
> had to have been uncomfortable with what they witnessed.  It
> not only made me uncomfortable, but I was embarrassed as
> well.   The incident should never have taken place in the
> manner in which it happened.

(Doc. 41-6:1, Exh. 4.)  An employer's honest and reasonable belief, even if wrong, that
a Title VII claimant did in fact commit the violation with which he is charged successfully
rebuts any prima facie case of disparate treatment.  Jones v. Gerwens, 874 F.2d 1534,
1540 (11th Cir. 1989) (citations omitted).  Based on the consistency of all four witness
statements, AutoZone's belief that Pitts did commit the alleged violation with which he
was charged was honest and reasonable.  AutoZone has satisfied its burden of
producing a legitimate, nondiscriminatory reason for terminating Pitts.

### 3.  McDonnell Douglas Step Three: Pretext

"Once a defendant offers a legitimate, nondiscriminatory reason for its actions,
the plaintiff must attack that reason 'head on and rebut it' so as to show that the reason
is really pretext for discrimination."  Sermons, 227 F. Supp. 2d at 1381 (quoting
Chapman v. Al Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)).  Pretext can be
established by evidence which "cast[s] sufficient doubt on the defendant's proffered
nondiscriminatory reasons to permit a reasonable fact finder to conclude that the
employer's proffered 'legitimate reasons were not what actually motivated its conduct.'"
Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994).  Stated
differently, "the plaintiff may attempt to establish that he was the victim of intentional
discrimination 'by showing that the employer's proffered explanation is unworthy of
credence.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)

(quoting Burdine, 450 U.S. at 256, 101 S. Ct. at 1095).  The proffered explanation is unworthy of belief if the plaintiff demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder" could disbelieve it.  Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)) (citation and internal quotation marks omitted).  In order to prove pretext, the plaintiff may offer "direct evidence of discrimination in the form of statements and admissions or by circumstantial evidence in the form of comparative or statistical evidence."  Woody v. St. Clair County Comm'n, 885 F.2d 1557, 1560 (11th Cir. 1989) (citing Miles v. M.N.C. Corp., 750 F.2d 867, 870 (11th Cir. 1985)).  The plaintiff may also establish pretext by showing that the employer did not rely on the proffered explanations for its actions.  See Israel v. Sonic-Montgomery FLM, Inc., 231 F. Supp. 2d 1156, 1162 (M.D. Ala. 2002) (citing Chapman, 229 F.3d at 1024).

The evidence fails to support Pitts's contention that AutoZone's decision to terminate him was a pretext for discrimination.  Pitts himself acknowledges that if a person "cuss[es], scream[s], holler[s] in front of customers, that person should be terminated.  We agree on that."  (Doc. 45-9:9, lines 14-17.)  Four witnesses stated that during his altercation with Pate, Pitts "yelled," "was loud," was "disrespectful," that the argument made them as well as AutoZone customers feel "uncomfortable," that Pitts's behavior was "shocking," and that customers were lost because of the confrontation. The only evidence contrary to the accounts of these witnesses is Pitts's own version of events.  Yet when asked during his deposition, "[D]o you find it odd that [the witnesses] all say that you were yelling at Ms. Pate?  Do you find it odd that there were three people saying that, and you're the only one denying it?  Do you think that odd?" Pitts answered, "That is odd." (Doc. 41-3:9-10.) Indeed, Pitts hedges in describing his conversation with Pate, just short of admitting what each witness to the incident had reported:

> A.  I was disagreeing with her.
>
> Q.  You said you weren't just receiving the information and you weren't just listening to what she had to say, but you had comments to her.  Here is your superior telling you you're

violating policy, right?

A.  And I'm disagreeing, correct, just like we're talking here.

Q.  And you stood up to her right?

A.  I did.  I told her that I did not go against company policy.

Q.  Yes.  I want to know if you think that was appropriate.  I'm using your words.  You said you stood up to her in a way she didn't like.  And you've already told me that you were in the military and you knew how to take orders.  Did you ever stand up to your – military lingo – but whoever your immediate officer was, did you ever stand up to him, disagree?

A.  You had disagreements.

Q.  So you stood up to her and interrupted her, correct?

A.  Correct.

Q.  And you argued with her?

A.  Correct.

(Doc. 41-3:8.)  When asked by human resources manager Sheena Code during her investigation of the incident whether his dispute with Pate became loud, Pitts responded that "[o]ur conversation got rougher." (Doc. 41-3:8.)  Michael Moore, who was deposed *on behalf of Pitts*, said it most clearly during his deposition:

Q.  Having been at AutoZone for as many years as you have, and you just acknowledged that customer service is the number one priority -

A.  It is.

Q.  I want you to go along with this hypothetical with me, okay?  You've got a store manager on the parts counter having a very heated, loud discussion with his supervisor, so loud that the customers that are in the store are uncomfortable enough to leave the store, okay?

A.  Okay.

Q.  You with me?

A.  I'm with you.

Q.  All right.  Caused a violation?

A.  Serious.

Q.  Serious.  In fact, that would be grounds for termination, wouldn't it?

A.  If somebody is being loud and using abusive language on the sales floor, yes, ma'am, that is grounds for a termination.

Q.  And if you have two or three people that actually witnessed that fact and corroborated that fact, is that kind of a no-brainer to you?

A.  <u>That's a no-brainer to me</u>.

(Doc. 49-5:5, lines 18-25; Doc. 49-5:6, lines 1-16) (Emphasis added.)

Pitts contends that AutoZone's decision to terminate him was pretextual because a female store manager, Nancy Book, had engaged her supervisors in a similarly tempestuous conversation and was not terminated.  Because Book's account of this conversation is undisputed, it is accepted as true and is transcribed below:

> I went to a meeting scheduled by the commercial regional manager to discuss the Big 10 account.  During the meeting the regional said that if we had any questions not to hesitate to ask.  I asked the regional a question and he said if I had read my e-mail I would know the answer.  I told him that if I had seen the e-mail, I would not be asking.  Then, he got upset and said we would talk after the meeting.  The regional and Walisha came up to me after the meeting and he said that perhaps I should consider not being a store manager and that maybe I didn't have what it takes to be a manager.  I said that I have been a manager for about five years, and I have run the most profitable store in the district.  I was angry and just walked out of the store.  I told the regional and Walisha, 'You think I'm just a dumb-ass manager.'  I kept cursing to myself out loud as the regional and Walisha followed me to my car.  They tried to stop me as I left.  I was angry and did not care who heard me as I left the store.  I drove quickly out of the parking lot and I went back to the store and told my staff that the regional and Walisha just think I'm a dumb-ass manager.
>
> I was told to go home immediately and I'm surprised I didn't get

> fired after that since Ken [Pitts] had just been fired for a much
> milder incident.  I refused to stay at home and came back to
> the store.  After a few days and an investigation of the incident,
> I was written up for conduct unbecoming a manager.

(Doc. 45-2:20.)

AutoZone's treatment of Book compared to its treatment of Pitts does not demonstrate pretext.  The Eleventh Circuit has stated that "[d]isparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts."  Osram Sylvania, Inc. v. Teamsters Local Union, 528, 87 F.3d 1261, 1265 (11th Cir. 1996).  "In determining whether employees are similarly situated . . . it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir. 1998), opinion modified by 151 F.3d 1321 (11th Cir. 1998) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."  Id. (internal quotations and citations omitted).  "We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  Maniccia v Brown, 171 F.3d 1364, 1368 (11th Cir. 1999); see also Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.").  Further, it is the plaintiff's burden, not the defendant's, to prove that employees are similarly situated and were not treated equally.  Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (citations omitted).  Pitts has failed to satisfy this burden.

Here, Pitts's altercation with Pate cannot properly be compared to Book's altercation with her supervisors.  Unlike the conversation which resulted in Pitts's termination, it is undisputed that Book's conversation occurred after a meeting of district store managers, outside the building in which the meeting occurred, in the presence of only Pate and the regional manager, and most importantly, outside the presence and

hearing distance of customers. (Doc. 49-3:2-4.)[3]  It is this last fact which clearly distinguishes the scenario that led to Pitts's termination from the scenario that resulted in a disciplinary write-up for Book.  It is elementary that a business succeeds or fails based on its profits and losses.  Profits and losses are determined, in large part, by customers.  When a store manager is shouting on the phone at a superior while several customers are present, causing those customers to feel uncomfortable enough to leave the store, such conduct is not only unprofessional and unbecoming of a leader, but it also negatively impacts the bottom line of the business.

In addition, Book's behavior is distinguishable from Pitts's behavior in that Book's altercation with her superiors directly followed a management meeting.  It is more acceptable for a store manager to have disagreements with upper level management at a management meeting rather than in the presence of customers because one major purpose of a management meeting is to expose and rectify disagreements and concerns among management.  Obviously, such disagreements must be expressed appropriately and constructively.  Clearly, AutoZone felt that Book behaved inappropriately.  Nevertheless, Book behaved inappropriately within the confines of the management meeting, not in the store she managed and not in the presence of customers and subordinates who looked to her for leadership.  Within their stores, each store manager *represents* AutoZone.  The highest authority figure with whom customers and store employees have daily contact is the store manager.  For all practical purposes, the store manager therefore *is* AutoZone.  Expectations of professionalism are at their utmost when the store manager is managing his store in the presence of customers and subordinates.  In a management meeting, the store manager is merely in the presence of his peers and superiors.  Thus, in the former scenario unlike in the latter, the store manager is a role model and representative of the company.  For these

---

[3]Plaintiff's Statement of Disputed Material Facts alleges that Book acknowledged to Pitts that the dispute for which she was written up "did occur in front of customers and employees." (Doc. 44:16, line 62.)  That statement is untrue.  Pitts stated in his deposition that Book used profanity "a lot in front of customers and stores and employees" because "[s]he told me."  (Doc. 45-9:10, lines 3-6.)  When asked what Book told Pitts, Pitts responded, "I don't remember exactly."  (Doc. 45-9:10, lines 7-8.)  Thus, Pitts was not discussing the specific incident for which Book was written up but his general observation that Book used profanity in front of customers at her store.

reasons, comparing the altercation leading to Pitts's termination to the altercation leading to Book's write-up is inappropriate as it, in the words of the Eleventh Circuit, confuses "apples with oranges" and requires this Court to "second guess" AutoZone's reasonable business decisions. It also should be noted that Book's behavior after the management meeting was not simply ignored and dismissed by AutoZone; rather, Book did receive disciplinary action in the form of a disciplinary write-up. Pitts thus fails in his attempt to demonstrate pretext by comparing his treatment with AutoZone's treatment of Book.

Pitts also contends, however, that because Pate, the alleged discriminator, participated in the decision to terminate him, AutoZone's proffered reasons for terminating him are pretextual. It is undisputed, however, that Pate did not participate in the actual decision to terminate to Pitts. Once Pate reported the incident with Pitts to human resources manager Sheena Code, Code initiated an investigation in which she interviewed Pitts and obtained witness statements. Tim Harrison, who worked in AutoZoner Relations at the AutoZone Store Support Center in Memphis, TN, made the recommendation to regional manager Joe Sellers to terminate Pitts. Sellers then made the decision to terminate Pitts. Both Harrison and Sellers are *male*. In fact, Sellers, the same man who terminated Pitts, is the same man who *hired* Pitts. Pitts does not allege that either Harrison or Sellers were discriminatory toward males. Although Pitts contends that his termination was based on all the alleged instances of discrimination against him by Pate (the audits, the assigned tasks, the lack of assistance, etc.), the deposition testimony of Sellers indicates otherwise:

> Q. What did you review before making your recommendation [to terminate Pitts]?
>
> A. There were statements that were given by – a statement given by Mr. Pitts and there were subsequent statements that were given by other AutoZoners in the store that had overheard this conversation between Mr. Pitts and Ms. Pate. Those statements had been reviewed with HR and also with AutoZoner Relations at the time.
>
> Q. Did you look at Mr. Pitts' personnel file?
>
> A. I did not look at his personnel file, no, sir.

Q.  Why not?

A.  I felt it not relevant to this one incident.

Q.  Why wouldn't it be relevant to this one incident?

A.  Because my decision of what we were going to do with Mr. Pitts' employment was based off this <u>one situation</u>.  It wasn't – you know, anything that's in his file wouldn't change anything he said or didn't say to Ms. Pate.

Q.  Are you telling me that you didn't take into account his past dealings with Ms. Pate?

A.  Actually, all those were – that was not part of the decision, no.  The decision was based off of facts and the statements. The loss of confidence piece that I had that was kind of building with Mr. Pitts was <u>my own facts</u> that I had gathered when I had conversation with him and spoke with him at his store and had issues with him, you know, of <u>not following directions that I had actually given him</u> about a situation in scheduling himself for a ridiculous amount of hours in the store.

(Doc. 41-4:3) (emphases added).

Thus, even assuming for purposes of discussion only that Pate did discriminate against Pitts, it cannot be said that such discrimination infected the decision to terminate Pitts.  Pate's role in Pitts's termination was far too removed and attenuated as to constitute discrimination.  Indeed, Pitts's termination was the culmination of a series of decisions by separate people, any one decision sufficient in itself to veto the ultimate decision to discharge Pitts.  First, when Pate reported the incident, Code could have decided not to pursue an investigation.  It was Code's decision to initiate the investigation. Pitts does not allege that Code was discriminatory toward males. Then, Harrison, a male, could just as easily have made a recommendation to Sellers not to terminate Pitts.  Next, Sellers, a male, could have rejected the recommendation that was given to him by Harrison and refused to terminate Pitts, the man he hired.  Instead, the decision to terminate Pitts was based on the corroborating accounts of witnesses to the incident and on Sellers's own loss of confidence in Pitts resulting from Pitts's refusal to follow instructions <u>given by Sellers</u>.

Pitts cites cases which suggest that all participants in the decision-making

process, not just the final decision maker, must be free of discriminatory intent.  Those cases do not assist Pitts.  In a case cited by Pitts, <u>Jones v. Gerwins</u>, 874 F.2d 1534, 1541 (11th Cir. 1989), a sergeant in the city's police force who was accused of discriminating against a subordinate officer recommended to the chief of police that the subordinate officer be suspended for violating a departmental rule.  The sergeant not only was authorized to discipline subordinate officers for "violations of any departmental rule," but the sergeant did, in fact, exercise that authority by making the specific recommendation of suspension.  In this case, however, it is undisputed that district managers like Pate not only lacked the authority to terminate store managers, but Pate made no recommendation that Pitts be terminated.  In fact, in her deposition testimony, Pate stated the following:

> Q.  As a district manager did you think that what [Pitts] did warranted termination?
>
> A.  Do I think it warrants termination?
>
> Q.  Yes.
>
> A.  Personally?  Not necessarily.  Again, it violates the policy. That's not my decision to rule, not my decision for any of that from where I stand in those situations.

(Doc. 45-5:11, lines 18-25.)

Thus, not only did Pate lack the authority to terminate Pitts, but she failed to make a recommendation that Pitts be disciplined at all and even questioned whether Pitts should have been terminated.  In another case cited to by Pitts, <u>Lam v. Univ. of Hawaii</u>, 40 F.3d 1551 (9th Cir. 1994), the district court determined that because insufficient evidence existed that the individually named faculty defendants were prejudiced toward a candidate whom they rejected for a university faculty position, plaintiff failed to show discrimination as a matter of law.  The Ninth Circuit reversed, holding that because the university had delegated to the entire faculty near-total control over hiring, the hiring process was not insulated from the illegitimate biases of any one faculty member, regardless of whether the alleged faculty discriminator was a named defendant.  <u>Id.</u> at 1560.  Here, it is undisputed that AutoZone never delegated near total control over terminating store managers to district managers like Pate.  In fact, it did not

delegate any control at all.  It is undisputed that once Pate reported the confrontation to Code, AutoZone did not contact Pate regarding the incident until the investigation had been completed.  It was at that time that Sellers *instructed* Pate to terminate Pitts. Thus, It is undisputed that Pate's input regarding the decision to terminate Pitts was thus never sought nor was it obtained by AutoZone.  Accordingly, Pitts has failed to show that AutoZone's decision to terminate him was a pretext for discrimination.

Finally, this Court expresses concern with respect to the theme which underlies Pitts's claims of discrimination.  Pitts's central contention is that Pate "was a lesbian and did not like men."  For one who is alleging that he is a victim of discrimination, Pitts is surprisingly quick to publish "discriminatory," stereotypical statements about another.

### III.  SUMMARY

Pitts has failed to prove that AutoZone discriminated against him on the basis of sex.  This conclusion is based on the following reasons:

1.   Ten out of twelve store managers in Pate's district were males;

2.  Nancy Book, one of the two female store managers under Pitt, stated that she resigned from AutoZone *because of* Pate;

3.  AutoZone replaced the other males with males; Pitts was the only AutoZone store manager replaced by a female;

4.  AutoZone terminated Pitts for the legitimate, nondiscriminatory reason of arguing with a superior in the presence of customers and for failing to reduce the number of hours worked after being instructed by regional manager Joe Sellers to do so;

5.   Several witnesses produced consistent accounts of the confrontation between Pitts and Pate.  Based on the witness statements, AutoZone's decision to terminate Pitts was reasonable;

6.  Pitts has failed to prove pretext.  Nancy Book was not similarly situated to Pitts.  An argument with superiors outside the presence of customers and following a management meeting is far less serious than an altercation with a superior in the presence of customers who feel uncomfortable enough to leave the store.  AutoZone did not ignore Book's behavior but disciplined her;

7.  Pate was far too removed from the decision to terminate Pitts.  She not only

lacked the authority to terminate Pitts, but Pate's input about whether discipline was warranted or the type of discipline to be imposed were never suggested by Pate nor sought by AutoZone, and Pate questioned whether Pitts should have been terminated;

8.  Pitts was terminated not by a female but by Sellers, a male regional manager, who hired Pitts.  Sellers's decision to terminate Pitts was based on the recommendation of Harrison, another male AutoZone employee;

9.  Pitts was terminated not only because of his conduct during the confrontation with Pate but also because he failed to follow instructions from Sellers.  Pitts does not allege that Sellers harbored discriminatory animus toward males.

## IV.  CONCLUSION

1.  Plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that he was a victim of discrimination on the basis of sex under the FCRA.

2.  Defendant's Motion for Summary Judgment (Doc. 41) is granted.

3.  The clerk shall enter judgment dismissing Plaintiff's claims with prejudice.

4.  The clerk shall close the file.

**ORDERED** on June 7, 2006.

**/s/ Richard Smoak**
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**